W. B. Dunkelbarger, Appellee, v. J. B. Ladd, Appellant.

CONTRACTS: Breach—Contract Termination—Effect. A nondefaulting party to a contract who, because of a total breach of the contract by the other party thereto, proceeds to the formal termination of the contract in the manner *required by the contract*, is standing upon and enforcing the contract, and not *rescinding* it.

Headnote 1: 13 C. J. p. 608.

*Appeal from Polk District Court.*—Joseph E. Meyer, Judge.

March 15, 1927.

Rehearing Denied December 17, 1927.

The defendant appeals from a decree enjoining him from canceling contract giving plaintiff exclusive right to sell caster devices for which defendant had patents.—*Reversed.*

*Miller, Kelly, Shuttleworth & McManus,* for appellant.

*Guy A. Miller* and *Fred A. Utterback,* for appellee.

Morling, J.—The two cardinal questions submitted are: First, whether plaintiff has been guilty of such breaches of the contract as entitle the defendant, under its terms, to cancel it; second, whether the defendant has failed to perform conditions made by the contract precedent to his right to cancel.

The defendant was the owner of patents for casters designed for use on washing machines, beds, and other articles of furniture, and refrigerators. Before April 13, 1923, W. T. Lord had the exclusive sale and manufacturing right for the casters. On that date, the Nagle-Chase Company made a written agreement with Lord to manufacture the casters, and thereafter engaged in the manufacture of them, at least for the Maytag Washing Machine Company, which was taking large quantities. On August 30, 1924 (the Lord license having been terminated), defendant entered into a written contract with plaintiff and Charles E. Coker, by which defendant gave to plaintiff and Coker an exclusive right to sell the casters. The agreement stated:

"As a condition precedent to this contract and license it is hereby required by said Ladd, agreed by said Dunkelbarger and consented to by said Coker that the undersigned, W. B. Dunkelbarger, shall bind himself, his successors or assigns, and shall enter into an agreement with the Nagle-Chase Mfg. Co., that he will provide the funds immediately for the construction, by or under the supervision of said Nagle-Chase Mfg. Co., of a complete set of dies for the manufacture of one set of a standard size of casters, either the furniture or bed caster, which it is understood can be completed in about ten weeks; and within four months from this date to provide funds for the construction of a complete set of dies for a standard size of the other type of caster, either bed or furniture; and later as conditions warrant, and as called upon by the manufacturer, to provide funds and arrange for the construction of a complete set of dies for the refrigerator caster, within one year from this date, and to spend for such dies the amounts necessary up to ten thousand ($10,000.00) dollars as called for by said manufacturer; with the understanding that the dies so manufactured are to be and become the property of said Dunkelbarger, his successors or assigns, to be used for the purposes stated, in consideration whereof he is to receive from the manufacturer a bonus or royalty amounting to one cent (.01) per set on all casters made, sold and paid for, with the exception of the Maytag 1924 contract; such bonus or royalty payments to said Dunkelbarger for the use of said dies to continue during the life of the patents, and so long as they shall be used for the manufacture of casters for said Ladd; with the provision, however, that in case of the cancellation and termination of this distributors' contract for any reason, said Ladd hereby agrees to buy, and said Dunkelbarger to sell, at the original cost price, such of said dies as are in good condition and as are in actual production of goods acceptable to the trade, whereupon such royalty or bonus payments shall cease.

"In consideration of the selling rights herein given them, said Dunkelbarger and Coker hereby jointly and severally agree that they will and do accept the right and license herein given, and that they will devote their time and best efforts to promote the sale of casters and caster devices and to secure orders for such devices to be made in accordance with such inventions, to the end that a large and profitable business may be built up; and

to that end they more especially and specifically agree and covenant as follows: That for the first year of the life of this contract they themselves will each travel on the road or be otherwise employed exclusively in sales efforts in behalf of these casters, besides engaging such other salesmen as they may deem desirable; that during the second year of the life of this contract, they will secure bona-fide orders for not less than one million (1,000,000) casters." (Here follow stipulations for the number of orders to be received during succeeding years.)

Plaintiff and Coker further agreed to make suitable contract for the manufacture of casters with the Nagle-Chase Company or other suitable factory to be approved by defendant, "to secure the manufacture of casters to fill the orders secured by them, of good material and sound workmanship and in accordance with said inventions or improvements thereon under permissible modifications as authorized by said Ladd." It was agreed that all of the terms of the contract were of its essence, and that, if plaintiff and Coker should fail "to carry out any of the terms of this agreement," defendant might, at his option, serve notice of cancellation in manner stipulated, whereupon the party so served should have 30 days from service, "to cure the transaction of the lapse or omission complained of in such notice and thereby retain this contract and the rights and privileges herein granted in full force and effect; and in the event he does not, at the option of said Ladd, this contract and all rights and privileges granted hereunder shall terminate and cease as to the party so served and failing to cure."

Coker's services were unsatisfactory to all concerned, and his interest was relinquished to plaintiff. We may at this point consider plaintiff's claim that the price of the dies to be made by the Nagle-Chase Company was $1,400 per set. Plaintiff rests this contention upon the Lord contract of April 13, 1923, and a supplementary agreement between plaintiff and the Nagle-Chase Company, made August 30, 1924, the date of the contract between plaintiff and defendant. By the Lord contract it was agreed "that for each style of caster to be manufactured by" the Nagle-Chase Company, Lord should pay to them $1,400 "for the necessary dies and tools." By the agreement between plaintiff and the Nagle-Chase Company it was recited that Lord's selling rights had been canceled for good cause, and contract made be-

tween Ladd and plaintiff; that the contract between Lord and the
Nagle-Chase Company was to be continued in full force between
plaintiff and the Nagle-Chase Company, plaintiff being substi-
tuted in place of Lord, "with the following modifications and
additions: The undersigned, W. B. Dunkelbarger, hereby binds
himself, his successors or assigns, that he will at once provide
funds for the manufacture, under the supervision of said Nagle-
Chase Mfg. Company, of a complete set of dies for one set of
standard size of either the furniture or bed caster * * * and
within about 4 months to arrange and provide funds for the con-
struction of a full set of dies for the other type of caster, either
bed or furniture; and later as conditions warrant, and provide
funds for a complete set of dies for the refrigerator caster, and to
furnish funds for said dies, all within one year from this date or
as called for, up to the amount of $10,000.00, with the under-
standing that the dies so made are to be the property of said
Dunkelbarger, his successors or assigns, to be used for the pur-
poses stated."

It will be noticed that this last provision is the same, except
the phrase "about 4 months," as that in the contract between
plaintiff and defendant. Both of plaintiff's contracts provide for
the making of three sets of dies, and contemplate that the cost
may run up to $10,000, which would be an average of more than
$3,000 per set. It appears also that plaintiff was later given an
interest in the Maytag contract to furnish casters, under which
plaintiff furnished $1,500 as the cost of the dies. He also fur-
nished dies for casters sold to the Dexter Company, for which he
was charged $984. No claim was made, prior to the present suit,
that the price of the dies to be made under plaintiff's agreement
with defendant or with the Nagle-Chase Company was to be
$1,400. Plaintiff's contracts were not so construed in practice,
and his contention in this respect cannot be sustained.

On June 15, 1925, defendant served plaintiff with notice of
intention to cancel, based upon two grounds: In substance, first,
that plaintiff had neglected to supply funds for the manufacture
of dies, as agreed; second, that plaintiff had failed to carry out
his agreement to promote sales. On July 17, 1925, defendant
served notice of termination.

I. Did plaintiff fail to fulfill his agreement to provide funds
for the manufacture of dies? He does not claim to have fur-

nished the $10,000. He does not claim to have ordered the Nagle-Chase Company to make either of the sets of dies stipulated for in the contract. He says in one place in his testimony that he has paid for dies close to $6,000, and in another place that he has expended, in promoting sales of casters, with the amount deposited with the Nagle-Chase Company, close to $10,000. The evidence shows that he was in financial difficulties; that the two checks sent by him before February 9, 1925, had been protested; that, as noted in the letter about to be referred to, he admitted "to have held all parties concerned at a standstill." The evidence shows that he advanced nothing for the three sets of casters mentioned in his contract, before February, 1925. Notice of intention to cancel had been given to him by defendant, January 15, 1925. On February 9, 1925, plaintiff sent to the Nagle-Chase Company a draft for $3,000, stating:

"This to finish payments of the two style of bed caster dies and pay the balance which is due on the improvements for the Maytag dies. I will expect you to submit samples and test all casters so that they will be acceptable to the trade and also Mr. Ladd's attorney. And I assure you we will put forth our best efforts to sell the same. * * * I am very sorry to have held all parties concerned at a standstill but feel confident now that they will be no delays in the future for the want of funds."

The evidence in regard to the Maytag dies is that the Maytag Company wanted to make changes in the casters, which would necessitate extra dies. The Nagle-Chase Company under their contract was required to pay for any new dies. Plaintiff wanted to participate in the Maytag business and its earnings. An agreement was made between the Nagle-Chase Company and plaintiff by which, as the evidence shows, to encourage plaintiff, plaintiff was to pay $1,500 for the new Maytag dies and have an interest in them and in the profits of the Maytag contract. As has been noted, a contract with Maytag had been made before the contract between plaintiff and defendant, and was expressly excluded from its operation. The letters from defendant to plaintiff expressly stated that the money used for the Maytag dies was not to be credited on the $10,000. Plaintiff says that he did not agree that this $1,500 should not be credited upon the $10,000, but the evidence is clear that he had no right to have it so credited. $984 has been used for making dies for the Dexter Washing

Machine Company. Various sums were charged for the expenses of plaintiff's agents and other items not necessary to enumerate. The evidence shows that, of the $3,000, there was left in the hands of the Nagle-Chase Company $2,671.46 that would have been available for dies. Two sets of dies, on plaintiff's claim that they were to cost $1,400 a set, could not have been paid for with the $2,671.46; but the evidence is clear that plaintiff did not authorize the making of either set of dies contemplated in his contract. Plaintiff takes the position that no orders had been obtained for casters for which he agreed to furnish the dies, and therefore he was justified in not ordering the manufacture of such dies. He agreed, however, "as a condition precedent to this contract and license to enter into agreement with the Nagle-Chase Company." He agreed absolutely to provide funds immediately for the construction of one set, and within 4 months to provide funds for the second set. Funds for refrigerator casters were to be provided later, as conditions warranted, and as called for by the manufacturer. The evidence is undisputed, also, that it was necessary to have the dies, and samples made from them, in order to make sales. Samples not made from the dies were handmade, soft, temporary, variable.

"The trade insists upon a die-made sample, for then they know the regular shipment will coincide with the samples furnished them; and you cannot furnish a die-made sample unless you have the dies."

On June 12, 1925, three days before the last notice of intention to forfeit was given, the Nagle-Chase Company wrote plaintiff, with respect to a tentative order for casters, that handmade samples would not be approved, but the samples must be made from the dies. Plaintiff's letter of February 9, 1925, imposes the condition, "I will expect you to submit samples and test all casters so that they will be acceptable," etc. The Nagle-Chase Company wrote plaintiff's wife, who was interested with him:

"Before we can proceed on the manufacture of the dies covering the above we must have your written instructions to that effect and with the return of the handmade samples sent you. Pending such written instructions you can well appreciate that we could not proceed with the manufacture of the dies and no further action will be taken until we hear from you in writing."

Plaintiff testifies:

"They called on me for finances, which as I thought there were no orders or any reasons to go ahead and make other dies, and I never sanctioned it. * * * During Mr. Coker's time, and in my own knowledge, we had covered sufficient territory to know that they could not be manufactured and sold in competition to —with the other caster on the market. Q. When they called upon you for money to make bed casters and furniture casters, why was it you didn't authorize them to expend money for that? A. Because that had not been accepted by the trade, or any orders secured or samples submitted."

He testified, with reference to the money sent, that he didn't direct them to use it; that he sent money on deposit; that he expected it to be used when it was called for and needed,—when he saw that the produce was worth financing. He says that he had had several notices to go ahead with the bed, furniture, and refrigerator casters.

Plaintiff's contract contemplated a large business, ranging from 1,000,000 casters the second year to 5,000,000 the fifth year. Without going further into details, it is sufficient to say that the plaintiff's agreement to provide funds for casters up to $10,000 within the year was absolute; that plaintiff did not provide for the first set immediately, or for the second set within four months, and was given notice of intention to cancel. While, upon his sending in the $3,000, the first notice was waived, the defendant was still insisting both upon efforts to make sales and upon providing funds for the dies. On no theory of the case was the money for the dies provided, or plaintiff's contract in this respect performed.

II. Did plaintiff devote his best efforts to promoting sales? He and Coker agreed to do this, and for the first year that they each would travel on the road or be otherwise employed exclusively in sales efforts, besides engaging such other salesmen as they might deem desirable. Coker secured no orders, and does not claim that he fulfilled the contract. Plaintiff took over Coker's interest, and afterward, for about two months, employed Hall as salesman; but Hall gave only half of each day to the caster business. He was in the employ of the Nagle-Chase Company, and the rest of the time engaged in selling other articles. An order was obtained from the Dexter Company, but through

the efforts of a member of the Nagle-Chase Company. In February, 1925, at a meeting between plaintiff, defendant, and members of the Nagle-Chase Company, plaintiff was told that the sales efforts were not satisfactory, and that, unless they were made so to the Nagle-Chase Company, defendant would no longer continue his relations to the deal. Plaintiff was notified at other times, before and after the $3,000 was deposited, of dissatisfaction. He referred to his financial difficulties, and promised to provide funds, not only for financing dies, but to keep salesmen on the road. Plaintiff never obtained any orders. While he testifies that he was giving his time to the business and making extensive trips in its interest, and while defendant and the Nagle-Chase Company knew of Coker's withdrawal, and did not object to it, still defendant insisted that plaintiff was to provide other salesmen. He did not do so. It was arranged in February that the salesmen, including plaintiff, would make reports to a member of the Nagle-Chase Company, who was to coordinate their efforts and systematize the business so that prospects could be followed up. Plaintiff testifies that the casters could not be sold in competition with others. The circumstances discredit his contention that he performed his contract to travel on the road or be otherwise employed exclusively in sales efforts. The contract contemplated that both Dunkelbarger and Coker should do this, and that other salesmen might be employed. By later arrangements, plaintiff promised to provide for the employment of salesmen. As has been noted, the making of the dies and of samples from them was essential to efficient sales effort. By the express terms of the contract, the furnishing of the money for the construction of the dies was a condition precedent to plaintiff's rights. We are of the opinion that plaintiff failed to carry out the terms of his contract with respect to the promotion of the dies.

III. Plaintiff argues that defendant could not cancel the contract without buying such of the dies as are in good condition and in the actual production of goods acceptable to the trade. The dies for the Maytag casters were made under a separate agreement between plaintiff and the Nagle-Chase Company. Under it the plaintiff received a part of their royalties. The dies for the Dexter Company were not furniture, bed, or refrigerator casters, and were not within the terms of the agreement that, in

case of termination of distributor's contract, defendant agrees "to buy at the original cost price, such of said dies as are in good condition and as are in actual production of goods acceptable to the trade, whereupon such royalty or bonus payments shall cease." This provision is not contained in the forfeiture clause. The forfeiture clause is, in terms, absolute and unconditional. The last above quoted clause relied upon specifically relates to "said dies:" that is, the three sets specifically named, and those that are used in the production of acceptable goods on which royalty is being paid. The only evidence relating to the Dexter Company dies is that they were furnished. There is no evidence that any royalties or bonuses are being paid on account of them, nor what their condition is, or that they are used in actual production.

The plaintiff's agreement to provide funds was made "a condition precedent to this contract." The manufacture of the dies was essential to enable plaintiff to make sales. The making of the sales was of the essence and the entire consideration of the contract. The defendant, in giving notice and declaring termination of the contract, was not rescinding it. He was thereby standing upon and enforcing the contract. *Mintle v. Sylvester*, 202 Iowa 1128. See 13 Corpus Juris 608. Plaintiff's breach was total,—went to the entire consideration, and discharged the contract. 3 Page on Contracts (1st Ed.), Sections 1431, 1447. Defendant asks, in his answer, decree that plaintiff has no further right in the contract. He is entitled to such relief.

The judgment is—*Reversed*.

EVANS, C. J., and DE GRAFF and ALBERT, JJ., concur.